## Case No. 8,897.

### McLEOD v. CALLICOTT.

[Chase, 443;[1] 10 Int. Rev. Rec. 94; 2 Am. Law T. Rep. U. S. Cts. 113.]

Circuit Court, D. South Carolina. June Term, 1869.

WAR — CAPTURED AND ABANDONED PROPERTY — TREASURY AGENT — HOW PROPERTY RECOVERED — COURT OF CLAIMS.

1. No agent of the U. S. treasury department under the captured and abandoned property act, was justified in receiving after June 30. 1865, any captured or abandoned property unless theretofore surrendered by Confederate agents or officers, much less making any seizure of unsurrendered property.

2. Property surrendered by the military authorities of the Confederate government could not be released by any state or provost court.

3. A treasury agent, acting under color of the captured and abandoned property act. under which he is appointed, or under a mistaken sense of duty, can not be held responsible in a suit at law, or other personal proceeding.

[Cited in Lamar v. McCulloch, 115 U. S. 163, 6 Sup. Ct. 11.]

4. The only remedy provided for the injured party is his right to prosecute his suit before the court of claims, within two years after the close of the war.

During the Civil War, the congress of the United States, on March 12, 1863, passed a law known as the "Captured and Abandoned Property Act" [12 Stat. 820], which directed the secretary of the treasury to appoint certain agents, whose duties were to receive from the military officers and from private soldiers, all property captured by the forces of the United States within his agency. They were also to take possession of property abandoned by its owners, and all property thus received was sold by them, and it was provided that the proceeds should be paid into the treasury. The act further provided that all citizens of the United States who had remained loyal to the government of the United States during the war, should have the right at any time within two years after the close of the war to file their petitions in the court of claims, and on furnishing proof of their loyalty, that court was authorized to order the proceeds of such property to be returned to them out of the treasury of the United States. This being the law, and the war having practically terminated in May. 1865, the secretary of the treasury, on June 27, 1865, addressed a circular to those treasury agents charged with the duty of collecting captured or abandoned property, directing them to dispose of the property then on hand, and to refrain from receiving any more after the 30th inst. — except such as had been actually captured or surrendered by military or naval officers or agents of the Confederate States, and which had not been delivered before that day. On July 27, 1868 [15 Stat.

1 [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

243], the congress passed another act declaring the intent of the several laws relating to captured and abandoned property, by which it declared that the true intent and meaning of those acts was that the remedy given before the court of claims, should be exclusive of all other remedies, and that the owner of any property taken as captured or abandoned by agents of the treasury department, in virtue or under color of said act, "should be precluded from suit at common law or any other mode of redress whatever, before any court or tribunal other than the court of claims." Under these circumstances, Callicott being a supervising agent of the treasury department of the United States, under the captured and abandoned property act, operating in South Carolina, on October 21. 1865, seized and carried off thirty-nine bales of cotton belonging to the plaintiff, Alexander McLeod. Thereupon McLeod made divers attempts to have his property restored to him. He took proceedings before the provost court, one of the military civil tribunals established in South Carolina by the military authority for this purpose, and failed, that tribunal adjudging that the seizure was proper, or that he had no remedy before it. He then applied to the secretary of the treasury, who ordered a restoration of it, and Callicott refused to do so, unless a bond of indemnity should first be given to himself. Thereupon, at the opening of this court in this district, this suit was brought, —an action of trespass to recover the value of the cotton, together with vindictive damages for the tort. The defendant plead specially that what he did was as special supervising agent of the treasury department, acting by virtue and under color of the captured property act, to this general replication. On the trial the plaintiff proved the taking of the cotton on October 21, 1865, and its value. That Callicott had told the witness Townsend, that he knew he had no authority to take the cotton, and that he would return it to McLeod, if he would pay him two hundred dollars, or some such matter. That a considerable correspondence had taken place between the plaintiff's counsel and Callicott, on the subject of a restitution of this cotton, in which they urged and argued the wrongfulness of the seizure, on the law and the facts. and on his refusing to restore it, they had made application to the secretary of the treasury, who eventually ordered its restitution. But that Callicott had suppressed in his report on the case to the department very material—the most material portions of this correspondence with counsel. and had refused to obey the order of the secretary unless the plaintiff gave him a bond to indemnify him from all future liability for his conduct. The defendant, on his part, proved and relied on the proceedings in the provost court as evidence of his bona fides in making the seizure, and as being the sentence of a court of competent jurisdiction, which had

adjudicated the rights between the parties in a suit before it, between the same parties, and about the same subject-matter.

J. B. Campbell, for plaintiff.
Corbin, U. S. Dist. Atty., for defendant.

CHASE, Circuit Justice (charging jury). The district attorney has asked for various instructions which the court will decline to give, not that we doubt the general correctness of most of the legal propositions contained in them, but we prefer to give you what we conceive to be the law in the case, in our own language, embodying the instructions asked, so far as we think them correct, in what we say. This is an action of trespass brought by Alexander McLeod against T. C. Callicott. The plaintiff alleges that thirty-nine bales of cotton belonging to him, were wrongfully taken by defendant and converted to his own use. The defendant pleads in justification, not denying the taking, but averring that what he did was done as special supervising agent of the treasury department of the United States, and in accordance with law. The plaintiff replies, denying the truth of this averment, and insisting that in what Callicott did he did not act as agent, but wrongfully and without justification in law. The pleadings present the issue which you are to try. First, did this cotton belong to Alexander McLeod, the plaintiff, in October, 1865? Was it his property at that date? And second, was the defendant justified in what he did by virtue of his office as supervising agent of the treasury? That the cotton belonged to the plaintiff, unless his title had been divested by capture, seems not to be questioned. The second question alone, therefore, is important. Under several acts of congress, during the late war, supervising agents of the treasury department were appointed in the several insurgent states, and charged with certain specific duties. Among these duties was that of receiving from the military officers of the United States all property captured by them, with instructions to turn it over to the proper authorities, for sale and for account. In respect to citizens of the United States, who had maintained a loyal adhesion to the government of the United States, it was provided by law that this property or proceeds should be returned to them upon making the necessary proofs in the court of claims, at any time within two years after the close of the Rebellion. It is alleged, and not denied, that Callicott was supervising agent, and had the general authority. It was his duty to receive from military officers, and from private soldiers, all property captured by the forces of the United States, during the recent war, within his agency.

If this case depended on this general authority, the only question to be determined would be whether the cotton in question was captured property. But there is something

more in this case. These supervising agents were appointed by the secretary of the treasury, under regulations approved by the president of the United States, and were subject in all respects to his direction and control; and the general regulations established had relation only to a state of war. Now, actual hostilities between the insurgent states and the United States terminated practically in May, 1865. In the state of South Carolina a provisional government was organized, under a proclamation of the president, in June or July of that year, and the secretary of the treasury, having reference to the changed condition of affairs, on June 27, 1865, addressed a circular to those treasury agents, in which he prescribed a rule for their government in the new state of things. (The chief justice here read the fourth section of the circular.) This section provides that officers "charged with the duty of receiving and collecting, or having in their possession or under their control, captured, abandoned, or confiscable personal property, will dispose of the same in accordance with regulations heretofore prescribed, and refrain from receiving such from military or naval authorities after the 30th instant." The general regulation which required Mr. Callicott to receive all captured property from officers of the United States was thus rescinded on June 27, 1865, with the following limitation: "This will not be considered as interfering with the operations of agents now engaged in receiving or collecting the property recently captured by or surrendered to the forces of the United States, whether or not covered by or included in the records delivered to the United States military or treasury authorities by rebel military officers or cotton agents." The new regulation or prohibitory order, therefore, did not extend to property which had been captured or surrendered by military officers of the Confederate government to the United States. But with that exception the prohibition is complete and final, and no agent of the treasury department was justified in receiving, after June 30, 1865, any captured property, unless theretofore surrendered; much less was any such officer warranted in making any capture of unsurrendered cotton himself, after that date, with or without military aid. He had no authority to do so. All his powers, as we have said to you, were derived from the treasury department, and when the treasury department withdrew that general authority it was at an end. The question, then, in this case, is whether this was a part of the property which had been surrendered by the military authority of the Confederate government to the United States prior to June 27, 1865. You have heard all the evidence, and it is your province to determine whether or not this property was in that category. If it was, then it was Callicott's duty to receive it and transmit it to the authorities of the United States for sale, and the only remedy which the owner or claimant of the

cotton could possibly have would be by application to the court of claims of the United States. The whole matter seems to be narrowed down to the simple proposition whether the evidence before you satisfies your minds that the cotton was included in the surrender referred to in the secretary's instructions of June 27. If it was so included, then the court charges you that neither the action of the provost court, relied on by the defendant, nor the action of any state court could withdraw it from that category without the consent of the United States. If it was on June 27 captured property, in this sense, that is, property surrendered by the military authorities of the Confederate government to the United States, then it remained captured property, and could not be released by the action of the provost court. That action, if intended to have this effect, was without sanction of law, and of no avail. If it was such property, it was the duty of the defendant to take possession of it; if not, his seizure was unlawful. But there is another question, not necessarily determined by the character of the property. on which it is the duty of the court to make some observations. By an act passed on July 27, 1868, congress declared the intent of the several acts relating to captured property. Among these was the abandoned or captured property act of March 12, 1863, of which, as well as of the others, the true intent was declared to be that the remedy given in cases of seizure by preferring claims in the court of claims should be exclusive, precluding the owner of any property taken by agents of the treasury department as abandoned or captured property, in virtue "or under color of said act" from suit at common law or any other mode of redress whatever, before any court or tribunal other than the court of claims.

It will be for you to say whether the defendant, in taking this property, proceeded under color of that act. If he was proceeding in good faith, believing himself to be warranted as the officer of the national government in taking charge of the cotton under that act, we think he is covered by its provisions. We adopt this view the more readily because in a subsequent part of the act it is provided that "in all cases in which suits of trespass" (which is this case) "may have been brought, or shall hereafter be brought, against any person for or on account of private property taken by such person as an officer of the United States, by virtue of any act relating to captured or abandoned property, and the defendant shall plead, or allege in bar thereof, that such act was done or omitted to be done by him as an officer of the United States, in the administration of one of the acts aforesaid, or in virtue or under color thereof, such plea or allegation, if the fact be sustained by proof, shall be deemed and adjudged in law to be a complete and conclusive bar to any such suit or action. It is our duty, under this act, to say to you that the plea of the defendant in this case is a conclusive bar to this action, if you find affirmatively that the acts of his complained of in the declaration were done by him in virtue or under color of any of the acts referred to. If it was done by him as supervisory or special agent, under a mistake as to the character of the property, he is in our judgment protected by this act. It would not protect the United States from a demand in the court of claims for this property, but it would protect the officer against a private suit, if he acted under color of this law, or under a mistaken sense of duty, though not in strict pursuance of the law. You have heard all the evidence, and it is for you to judge whether he acted under a sense of duty or not. You can weigh the whole evidence and determine that matter for yourselves.

The only remaining point on which it is proper to instruct you is this:—It is claimed by counsel that in the event you should find for the plaintiff, you may assess what are called vindictive damages. The court can not say that to you. If you find for the plaintiff, it will be your duty to assess the value of the property at the time of the conversion, October 21, 1865, with lawful interest from that date.

THE CHIEF JUSTICE added:—If there is anything in the evidence which satisfies you that the defendant acted without any color of law, willfully and in flagrant disregard of his duty—then you have a right to assess vindictive damages. But it is for you to say whether there is anything of that sort in the proof.

The jury returned the following verdict: We find for the plaintiff, eleven thousand seven hundred and sixty-eight dollars.[2]

The defendant then moved for a new trial. (1) Because the finding of the jury was against the evidence. (2) Because it was against the law as laid down by the court.

On a subsequent day, the motion for the new trial having been argued by counsel, the court pronounced its opinion.

CHASE, Circuit Justice.—This is a motion for a new trial. The grounds assigned are that the verdict was contrary to the charge of the court. The court left to the jury the question of the good faith of Callicott as an officer of the government intending the honest exercise of his functions in the seizure of the cotton. We also left to the jury the question whether the cotton itself was part of that surrendered by the military authorities of the Confederate government, upon the termination of hostilities.

Upon the second question, we think the finding was clearly right. It is not impossible that this cotton was in fact the prop-

---

[2] [10 Int. Rev. Rec. 94. and 2 Am. Law T. Rep. U. S. Cts. 113, give $11,700.68.]

erty of the Confederate government during the Rebellion, and included in the surrender made by the generals of the Confederate armies at the conclusion of hostilities. It is enough to say that no evidence to this effect was offered to the jury. But there was some of a contrary tendency.

It was, therefore, clearly a seizure unwarranted of law. The only question was whether Mr. Callicott was protected by his official character. We thought he was, if he was acting in good faith, in the exercise of his authority as supervising agent, though mistaken as to the character of the cotton. The question of good faith, of honest mistake, was left, and, we think, properly left to the jury. We thought that the evidence taken altogether warranted a verdict in favor of the defendant, and should have been quite satisfied had such a verdict been rendered.

We can not say that there was no evidence that warranted the conclusion of the jury. Townsend's statement, admitted by the district attorney, was that Callicott told him that he knew he had no authority to make the seizure; that he was willing to take two hundred dollars or some such sum, and release the cotton. There was testimony also which showed an omission in Callicott's report to the secretary of the treasury of an important part of the correspondence between himself and the counsel of the defendant. And there was evidence also that when the whole matter had been submitted to the secretary·of the treasury, and he had directed that the cotton should be released upon the defendant giving the usual certificate of probable cause, Callicott required, as an additional condition of release, a bond of indemnity to himself. The jury might possibly have inferred, from all these things, that Callicott was not acting in good faith. We can not say that the conclusion was wrong.

Upon the whole evidence, and we do not go into that in favor of the defendant, our conclusion was the other way. But the matter of fact was fairly left to the jury, and was peculiarly within their province.

We can not set aside their verdict because the jury did not agree with us as to the preponderance of the evidence.

The motion for a new trial will be overruled.